1  Kristen Law Sagafi (SB# 222249)
   TYCKO & ZAVAREEI LLP
2  483 Ninth Street, Suite 200
   Oakland, CA 94607
3  Telephone: (510) 254-6808
   Facsimile:
4  ksagafi@tzlegal.com

5  Craig L. Briskin (*pro hac vice* to be submitted)
   MEHRI & SKALET, PLLC
6  1250 Connecticut Ave., Suite 300
   Washington, DC  20036
7  Telephone: (202) 822-5100
   Facsimile: (202) 822-4997
8  cbriskin@findjustice.com

9  *Attorneys for Plaintiff (additional counsel listed on*
   *signature page)*

10

11

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14

15  Gregory Smith, on behalf of himself and all        No. _____
    others similarly situated,
16
                    Plaintiff,
17
    v.
18                                                       **CLASS ACTION COMPLAINT**
    WELLS FARGO & COMPANY, WELLS
19  FARGO BANK, N.A., D/B/A WELLS
    FARGO DEALER SERVICES,
20  NATIONAL GENERAL HOLDINGS              **DEMAND FOR JURY TRIAL**
    CORP., and NATIONAL GENERAL
21  INSURANCE COMPANY,

22                  Defendants.

23

24

25

26

27

28

Plaintiff Gregory Smith, on behalf of himself and all others similarly situated nationwide, brings this action against Defendants Wells Fargo & Company, a Delaware Corporation, Wells Fargo Bank, N.A., a National Banking Association, doing business as Wells Fargo Dealer Services (together "Wells Fargo"), National General Holdings Corp., and National General Insurance Company, formerly known as GMAC Insurance (together "National General") (collectively "Defendants"). Plaintiff, by and through his attorneys, alleges as follows based on information and belief and investigation of counsel:

### INTRODUCTION

1.    In the latest example of Wells Fargo's recurring practice of defrauding its own customers, Wells Fargo has admitted to engaging in a long-running scheme that forced hundreds of thousands of customers of automobile financing to unwittingly pay for automotive insurance they did not need, leading to hundreds of thousands of erroneous loan delinquencies and tens of thousands of illegal vehicle repossessions.

2.    The scheme was first reported by the *New York Times* on July 27, 2017, after the *Times* obtained an internal, non-public report commissioned by Wells Fargo executives that estimated that more than 800,000 people who financed car loans through Wells Fargo were wrongfully charged for force-placed Collateral Protection Insurance ("CPI") or Gap insurance ("Gap"), despite having insurance of their own.  By forcing hundreds of thousands of customers to purchase the unnecessary Gap or CPI insurance, which was underwritten by National General, and by then automatically deducting the Gap or CPI premiums from customers' bank accounts, Wells Fargo earned millions of dollars in interest payments, penalties, fees, and kickbacks in the form of commission payments.

3.    Wells Fargo's customers, in turn, were subjected to deceptive late fees, insufficient fund charges, wrongful repossessions, and downgraded credit scores, even after many customers complained directly to Wells Fargo.

4.    Only after the *Times* article was published did Wells Fargo publicly acknowledge

CLASS ACTION COMPLAINT

the scheme, finally admitting that "customers may have been charged premiums for CPI even if they were paying for their own vehicle insurance, as required, and in some cases the CPI premiums may have contributed to a default that led to their vehicle's repossession."

5.      Among the victims of the scheme was Plaintiff, who signed on an auto loan financed through Wells Fargo and was forced by Wells Fargo to pay for CPI underwritten by National General despite maintaining his own insurance coverage. Because of Wells Fargo's deceptive and unfair forced placement of CPI on his account, Plaintiff's vehicle was repossessed, and he paid for CPI and other impermissible fees and charges that Wells Fargo never refunded.

6.      Plaintiff brings this action on behalf of himself and a Nationwide Class of all persons in the United States who obtained an automotive loan through Wells Fargo Bank, N.A. or its subsidiaries or divisions, and who were charged for GAP or CPI and/or related fees and interest at a time when the vehicle subject to the loan was covered under a separate automobile insurance policy.  Plaintiff also brings this action on behalf of a Tying Subclass of all persons in the United States who obtained a dealer-arranged automotive loan through Wells Fargo Bank, N.A. or its subsidiaries or divisions ("Wells Fargo") at a dealership at which Wells Fargo was a preferred or primary lender, and who were charged for CPI and/or related fees at a time when the vehicle subject to the loan was covered under a separate automobile insurance policy.  Plaintiff also brings this action on behalf of a Subclass of all persons in the State of Nevada who obtained a dealer-arranged automotive loan through Wells Fargo Bank, N.A. or its subsidiaries or divisions ("Wells Fargo") at a dealership at which Wells Fargo was a preferred or primary lender, and who were charged for CPI and/or related fees at a time when the vehicle subject to the loan was covered under a separate automobile insurance policy.

**JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this lawsuit has been brought as a class action on behalf of thousands of Class members, the aggregate claims of the putative Class members exceed $5 million exclusive of interest and costs, and one or more of the members of the putative Classes are citizens of a different state than each of the Defendants. This Court also has jurisdiction under

3                                    CLASS ACTION COMPLAINT

28 U.S.C. §§ 1331 and 1337 because this action arises under the Racketeer Influenced and Corrupt Organizations Act, the Sherman Act, and the Bank Holding Company Act.

8.    This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§ 1961, 1962, and 1964.

9.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 15 U.S.C. § 22. The Defendants transact business in this District and are subject to personal jurisdiction here, and a substantial part of the events giving rise to the claims occurred in this district.

## INTRADISTRICT ASSIGNMENT

10.    Pursuant to Local Rule 3-2(c), assignment to the San Francisco or Oakland Division is appropriate because "a substantial part of the events or omissions which give rise to the claim occurred" there.

## PARTIES

11.    Plaintiff Gregory Smith is a resident and citizen of Nevada, and at all times relevant to this complaint was a resident and citizen of Nevada.

12.    Defendant Wells Fargo & Company is a corporation and bank holding company organized under the laws of Delaware, with its principal place of business in San Francisco, California. Wells Fargo & Company is one of the nation's largest corporations, providing a wide-range of financial services to customers throughout the United States.

13.    Defendant Wells Fargo Bank, N.A., ("Wells Fargo Bank") is a national association bank chartered in South Dakota and headquartered in San Francisco, California. Wells Fargo Bank is Wells Fargo & Company's principal subsidiary, and Wells Fargo & Company exercises control over Wells Fargo Bank's policies and practices. Through Wells Fargo Dealer Services, Wells Fargo Bank originates and services loans to customers that are secured by those customers' vehicles.

14.    Defendant National General Holdings Corp. is a Delaware corporation and insurance holding company headquartered in New York, New York.

15.    Defendant National General Insurance Company is a Missouri corporation headquartered in Winston-Salem, North Carolina, and is a subsidiary of National General

CLASS ACTION COMPLAINT

Holdings Corp. National General Insurance Company provided insurance tracking services to Wells Fargo and underwrote the CPI policies that Wells Fargo billed to Plaintiff and the Class.

FACTUAL ALLEGATIONS

**A. Wells Fargo Deceptively Charged Hundreds of Thousands of Automotive Loan Customers for CPI They Did Not Need, Exacting Profits at Borrowers' Expense**

16.     Lenders often require borrowers to maintain insurance on insured collateral as a condition for financing a loan. When borrowers' insurance coverage lapses, lenders sometimes force borrowers to purchase insurance through the lender.

17.     While this so-called "force-placed" or "lender-placed" insurance is common in the home mortgage industry, it is significantly less common in the automotive loan industry. Most other major auto loan providers, such as Bank of America, Citibank, and JPMorgan Chase, do not force borrowers into such policies. One primary reason for this is that drivers are already required to maintain auto insurance to legally operate their vehicles in most states.

18.     Nonetheless, beginning in or around 2006, Wells Fargo began requiring its automotive loan customers to maintain insurance coverage on the vehicles securing the customers' loan. If a customer did not maintain his or her own insurance, or was otherwise unable to provide evidence of such insurance, Wells Fargo forced the customer to purchase lender-placed insurance underwritten by National General. Such insurance is commonly referred to as Collateral Protection Insurance, or "CPI."

19.     To determine whether a borrower had his or her own auto insurance, and thus whether the borrower would be charged for force-placed CPI, Wells Fargo sent the borrower's information to National General, which purportedly used a database to track the borrower's insurance status. If Wells Fargo and National General determined that a borrower lacked the requisite automobile insurance, or if his or her insurance had lapsed, Wells Fargo was legally required to notify the borrower and to request that the borrower provide proof of insurance. If the borrower was unable to do so, Wells Fargo was required to disclose to the customer that it was forcing the customer to purchase CPI.  Conversely, if the borrower *did* have the requisite auto

CLASS ACTION COMPLAINT

insurance, Wells Fargo was not permitted to charge the customer for duplicative CPI.

20.     This system, however, was largely ignored in practice. In reality, Wells Fargo frequently failed to notify borrowers of their insurance requirements and CPI charges, and routinely charged borrowers for CPI even when borrowers maintained their own independent insurance and notified Wells Fargo of the wrongfully placed coverage.

21.     According to a Wells Fargo consultant, Wells Fargo's failures to notify customers of its CPI protocol and forced placements violated the disclosure requirements of five states— Arkansas, Michigan, Mississippi, Tennessee and Washington—with respect to nearly 100,000 policies between 2012 and 2016.

22.     Because Wells Fargo often automatically deducted the CPI charges from customers' bank accounts, many customers never realized—or did not realize until after the fact—that they were being wrongfully charged for CPI that they had never requested or needed.

23.     Moreover, the force-placed CPI was often significantly more expensive than the automobile insurance that borrowers purchased on the open market.

24.     These practices continued for several years despite repeated objections from customers that they were being charged for unnecessary CPI that was not properly disclosed. Not only did Wells Fargo not reimburse such customers for the wrongful CPI charges, in many cases, Wells Fargo continued assessing the charges on customers without explanation, leading to increased fees, delinquencies, and repossessions, as described below.

25.     On an online database managed by the Consumer Financial Protection Bureau, customers lodged the following complaints relating to Wells Fargo's force-placed insurance practices, including the following:

> **07/26/2016**: After paying our car loan with Well fargo Dealer Service XXXX CA for the month of XXXX XXXX we receive[d] a call that stated that our payment was still outstanding because they had applied some insurance to our auto loan. We explained to the representative that we have always carried ins with XXXX XXXX without lapses. She state[d] it was a[n] easy fix and for us to call the insurance company to have them send over proof of insurance which we did the same day and call back the next day to be sure it was taken care of. The rep assure[d] us that all the charges would be remove. And because this was an error it would not be reported on our credit (This was very important because we were in process of getting a home loan and needed our credit to remain constant). However, on XXXX XXXX XXXX we find that Well Fargo have placed a 30 day

CLASS ACTION COMPLAINT

late report on our credit that caused our credit to fall XXXX points and our chance for the American Home Dream to slip away. When we called to ask what happen to this very simple correction they gave us several excuses and apologize only to say it would take them 30 to 45 days to correct after we submit a written dispute, again prove ins, send copies of credit reports and show credit when down before they would take this off of our credit reports. We have fought very hard to restore our credit and have waited 7 years after a for[e]closure to bring up our credit and to be able to buy a home again, only to have a big bank come along and wipe out our chances without concern for their error or the detriment that it cause hard working, bill paying American families. Any help you can offer in expediting this credit restoration would be very appreciated Thank you in advance for your assistance.

**11/09/2015**: Wells Fargo Dealer Services has contin[u]ously overcharged for the auto loan on my 2006 XXXX and kept me uninformed about details of my loan and its terms.
1 ) I just found out from a wells fargo dealer services representative that I was assessed/enrolled in comprehensive auto insurance through the Auto dealer XXXX at the time of the purchase as part of the re[q]uirement to qualify for the loan..At the time of the purchase I was not informed of this requirement. I was al[s]o asked to get a second comprehensive insurance for the duration of the loan which I also purchased independently. In essence I was asked to carry XXXX insurance policies on the same auto.
2 ) In reviewing my loan payments it appears my interest rate on the loan was raised without any notification. Wells Fargo Dealer Services reps have been extremely rude when inquir[]eing about my loan issues and very unco[o]p[e]rative with information about the details of the loan and its terms. 3 My car was repos[s]essed after only one month late on my loan payments. Fees and char[]ges for repossession, storage and penalties appear to be exce[s]sive. 4.Wells Fargo continues to charge for auto insurance (wells fargo insurance ) even though I have comprehensive insurance on the my veh[i]cle and have notified them of it. . If and where there have been deliberate overcharging and exploitation I want a refund on the overcharges and exce[s]sive fees.

**04/09/2015**: I am a single mother of XXXX who has been a loyal Wells Fargo customer for over 15 years. My loyalty stems from the fact that my family and I have XXXX accounts with Wells Fargo which is why I decided to use the Wells Fargo Dealer Services car loan service rather the other options that I had when I purchased my car in XX/XX/XXXX. . . Here is the brief about this case below : XXXX XXXX, Collections Manager is charging me for insurance when I already carry insurance through XXXX. This is a scam to steal funds from me! . . . I was surprised when my credit bureau report shows that I was reported late for late payment even though I had been paying my usual payment without including the Wells fargo added insurance since XXXX XXXX said it was taken care of[]. . . . In the mean time my credit worthiness is under attack and my FICO score has dipped negatively. The incorrect credit report needs to be corrected ; the late fees need to be removed ; and the harassing phone calls need to be stopped- XXXX XXXX continues to call me and that needs to stop!

26. Far from an innocent oversight, this deception was systematic, and Wells Fargo and National General gained significant revenue from it. As part of a revenue-sharing agreement

CLASS ACTION COMPLAINT

with National General, which reportedly ended in 2013, Wells Fargo received a kickback, in the form of a commission payment, each time it placed a CPI policy with a customer. For its own part, National General generated revenue from the underlying sale of each CPI policy.

27.    Wells Fargo also derived significant revenue in the form of increased interest payments by manipulating the order in which customers' monthly payments would be applied to their various loan-related fees. Specifically, Wells Fargo structured the order so that monthly payments would (1) first apply to the loan interest, (2) second to CPI interest, (3) next to the loan principal, (4) then to CPI principal, and (5) finally to payment variance, (6) CPI Variance, and (7) other charges.  This sequence ensured that payments were less likely to be applied to pay down existing principal, thus increasing the overall interest that borrowers paid Wells Fargo over the course of their loans.

28.    Additionally, because many customers chose to have their auto loan payments automatically deducted from their bank accounts, the undisclosed CPI charges often increased customers' monthly payments beyond what was available in their accounts, leading customers' accounts to be overdrawn. This resulted in additional revenue for Wells Fargo in the form of overdraft fees and other penalties.

29.    As a result of these policies, Wells Fargo's practice of forcing CPI on borrowers who already had insurance served as a profitable revenue stream for Defendants, incentivizing Defendants to ignore customer complaints and continue their deceptive and illegal practices for nearly a decade.

30.    Wells Fargo's practices directly harmed its customers on a number of fronts. Borrowers were forced to pay millions of dollars in premiums for insurance they did not need, in addition to the extra interest and overdraft fees described above.

31.    In many instances, these additional costs led to loan delinquencies that resulted in the repossession of borrowers' vehicles, sometimes on repeated occasions. Indeed, even after such vehicles were repossessed and sold, Wells Fargo continued to demand that borrowers make additional payments to pay off the loan.

32.    Such credit delinquencies have caused many borrowers' credit ratings to be

CLASS ACTION COMPLAINT

downgraded, leading to further injury in the form of decreased access to credit and/or higher interest rates and fees from other lenders.

**B. Wells Fargo Acknowledges the Scheme, But Only After It Was Revealed by the *New York Times***

33.    On July 27, 2017 the *New York Times* first publicly reported on the scheme in an article titled "Wells Fargo Forced Unwanted Auto Insurance on Borrowers." Among other things, the article reported that Wells Fargo's executives had commissioned an internal investigation and report in July 2016, prepared by the consulting firm Oliver Wyman, which found that more than 800,000 of Wells Fargo's auto loan customers were wrongfully billed for duplicative CPI, roughly 274,000 customers were pushed into delinquency, and almost 25,000 vehicles were repossessed.

34.    After the article was published, Wells Fargo, for the first time, publicly acknowledged the CPI scheme, but refused to admit the scope of the harm detailed in the Oliver Wyman report. In a statement, Wells Fargo admitted that "customers may have been charged premiums for CPI even if they were paying for their own vehicle insurance, as required, and in some cases the CPI premiums may have contributed to a default that led to their vehicle's repossession."

35.    The CPI-related revelations are not isolated incidents for Wells Fargo; rather, they are only the latest in a series of recurring scandals involving Wells Fargo's exploitation of its own customers.

36.    For example, the Department of Justice has sued Wells Fargo on behalf of members of the armed forces whose cars were illegally repossessed in violation of the Servicemembers Civil Relief Act. Wells Fargo agreed to pay $20 million in civil penalties and roughly $4 million in reimbursement to servicemembers who were harmed.

37.    Wells Fargo has also faced lawsuits and been assessed $190 million in fines relating to revelations that it instructed branch employees to open millions of unauthorized credit card and bank accounts. The scandal led to the resignation of Wells Fargo's former CEO, John Stumpf.

CLASS ACTION COMPLAINT

38.    Most recently, on August 4, 2017, Wells Fargo disclosed that it was investigating whether it wrongfully charged customers for fees to extend interest rate lock periods on residential mortgages, as well as harm caused by freezing or closing deposit accounts for suspected fraud.

39.    The latest CPI-related misconduct has raised concerns among analysts regarding the lack of oversight and compliance at Wells Fargo. Isaac Boltansky, an analyst at Compass Point Research & Trading explained that "[t]he steady drip of revelations is concerning as it makes quantifying and qualifying the extent of the internal control failures difficult." *See* Fortune, *Wells Fargo May Have Charged 500,000 Clients for Unwanted Insurance*, July 28, 2017. Christopher Wheeler, an analyst with Atlantic Equities, echoed the same sentiment, remarking that "[w]hat has been shown is that the bank was run for superior revenue growth, and the controls around managing that were clearly insufficient." *Id.*

## PLAINTIFF'S ALLEGATIONS

40.    In 2011, Plaintiff Gregory Smith financed the purchase of a 2007 Chevrolet Suburban with a loan from Wells Fargo.

41.    At the time of the purchase and throughout his ownership of the vehicle, Plaintiff had the legally required level of automobile insurance through GEICO and Allstate.

42.    Despite the fact that Mr. Smith had his own insurance coverage, Wells Fargo began billing Plaintiff for force-placed CPI, which included higher monthly premiums than what Plaintiff had paid under his GEICO and Allstate policies.

43.    Plaintiff, who is disabled, had almost paid off his automobile but could not keep up with the extra charges due to the CPI that Wells Fargo force-placed on his loan. Wells Fargo then repossessed his vehicle just before it was paid off.

44.    As a result of the unnecessary and duplicative CPI premiums, Plaintiff was assessed excessive fees, insurance, repossession costs, loss of his vehicle, and interest charged to him by Wells Fargo.

## TOLLING OF THE STATUTE OF LIMITATIONS

45.    At the time, Plaintiff and members of the Class did not know, and could not have

CLASS ACTION COMPLAINT

1  discovered through reasonable diligence, the true nature and scope of Defendants' forced-place

2  CPI scheme.

3      46.    Despite Defendants' continuous duty to disclose to Plaintiff and the members of

4  the Class the true character, quality, and nature of the CPI-related charges, Defendants knowingly

5  and actively concealed the CPI scheme, and Plaintiff and members of the Class reasonably relied

6  upon Defendants' concealment.

7      47.    Given such concealment, as evidenced by Defendants' refusal to disclose Wells

8  Fargo's internal investigation and report into its auto-loan business until it was first revealed in

9  the press, Plaintiff and Class members had no reasonable opportunity to discover the extent and

10 character of the CPI scheme until the July 27, 2017 *New York Times* article.

11     48.    Accordingly, any applicable statutes of limitation have been tolled by operation of

12 the discovery rule and the doctrine of fraudulent concealment. Further, Defendants are estopped

13 from relying on any statutes of limitation in defense of this action.

14                          **CLASS ACTION ALLEGATIONS**

15     49.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 on

16 behalf of themselves and the following Class and Sub-Class:

17     **Nationwide Class:** All persons in the United Sates who obtained an automotive loan
       through Wells Fargo Bank, N.A. or its subsidiaries or divisions, and who were charged for
18     CPI and/or related fees at a time when the vehicle subject to the loan was covered under a
       separate automobile insurance policy.
19

20     **Tying Sub-Class:** All persons in the United Sates who obtained a dealer-arranged
       automotive loan through Wells Fargo Bank, N.A., or its subsidiaries or divisions, at a
21     dealership at which Wells Fargo was a preferred or primary lender, and who were charged
       for CPI and/or related fees at a time when the vehicle subject to the loan was covered
22     under a separate automobile insurance policy.

23     **Nevada Sub-Class**: All persons in the State of Nevada who obtained a dealer-arranged
       automotive loan through Wells Fargo Bank, N.A., or its subsidiaries or divisions, at a
24     dealership at which Wells Fargo was a preferred or primary lender, and who were charged
       for CPI and/or related fees at a time when the vehicle subject to the loan was covered
25     under a separate automobile insurance policy.

26     50.    Excluded from the proposed Class and Subclasses are Defendants, their agents,

27 officers, and directors, and their families, as well as its parent companies, subsidiaries, and

28 affiliates, and any judicial officer assigned to this case. Plaintiff reserves the right to revise the

definition of the Class and Subclasses based on subsequent investigation.

51.    This action is brought and may be properly maintained as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3).

52.    <u>Numerosity/Impracticability of Joinder</u>: The members of the Class are so numerous that joinder of all members would be impractical. The proposed Class likely contains tens or hundreds of thousands of members. The precise numbers of members can be ascertained through discovery of documents in the possession of Wells Fargo and National General.

53.    <u>Commonality and Predominance</u>: The action involves common questions of law and fact that predominate over questions affecting individual members of the Class. Such common questions include, but are not limited to, the following:

    a.    Whether Wells Fargo unlawfully charged borrowers for CPI who maintained separate automobile insurance;

    b.    Whether Wells Fargo wrongfully charged borrowers fees and interest and/or repossessed vehicles as a result of forced CPI placements;

    c.    Whether Defendants failed to disclose or otherwise concealed material facts to borrowers regarding its CPI policies;

    d.    Whether Wells Fargo knew or should have known that it and National General failed to properly confirm whether borrowers had independent automobile insurance coverage;

    e.    Whether Defendants violated the federal statutes listed in the causes of action below;

    f.    Whether Defendants violated California Business and Professions Code §§ 17200, *et seq.*

    g.    Whether Defendants violated the Nevada Deceptive Trade Practices Act, NRS Chapter 598;

    h.    Whether Defendants have been unjustly enriched; and

    i.    Whether and to what extent Plaintiff and members of the Classes are entitled to actual damages, statutory damages, treble damages, punitive damages, restitution,

CLASS ACTION COMPLAINT

restitutionary disgorgement, and/or other equitable or declaratory relief.

54.    <u>Typicality</u>: Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and the members of the Class have been injured by Defendants' unlawful conduct relating to force-placed CPI policies.

55.    <u>Adequacy</u>**:** Plaintiff is willing and prepared to serve as representative of the Class and will fully and adequately assert and protect the interests of the Class. Plaintiff has retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiff nor his attorneys have any interests contrary to or in conflict with the Class.

56.    <u>Superiority</u>: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all members of the Class would not be economically feasible and is procedurally impracticable. While the Class in the aggregate sustained damages in the millions of dollars, the damages suffered by individual Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims. It would therefore be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford litigation, the prospect of individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.

57.    This action presents no difficulties in management that would preclude maintenance as a class action.

## CAUSES OF ACTION

**FIRST CAUSE OF ACTION**
**<u>Asserted on Behalf of Plaintiff and the Nationwide Class</u>**
**Violation of Racketeer Influenced and Corrupt Organizations Act ("RICO")**
**18 U.S.C. § 1962(c)-(d)**

58.    Plaintiff incorporates by reference every prior and subsequent allegation of this

CLASS ACTION COMPLAINT

Complaint as if fully restated here.

59.     Plaintiff brings this Count on behalf of himself and the Nationwide Class against Defendants for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964 for violations of 18 U.S.C. § 1962 *et seq.*

60.     Plaintiff, each member of the Class, and Defendants are "persons," as that term is defined in 18 U.S.C. §§ 1961(3) and 1962(c).

61.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

62.     Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions, such as 18 U.S.C. § 1962(d).

63.     As set forth below, over the course of nearly a decade, Defendants sought to extract millions of dollars from Plaintiff and the Class by billing them for unnecessary and undisclosed CPI policies in violation of sections 1962(c) and (d).

**A.      The CPI Enterprise**

64.     For purposes of this claim, the RICO "enterprise" is an association-in-fact, as the term is defined in 18 U.S.C. §§ 1961(4) and 1962(c), consisting of Wells Fargo & Company, Wells Fargo Bank, National General Insurance Company, and other Non-Parties affiliated with the RICO Enterprise, such as their respective officers, directors, employees, agents and direct and indirect subsidiaries (the "CPI Enterprise"). At all relevant times, each member of the CPI Enterprise was aware of the enterprise's conduct, was a knowing and willful participant in that conduct, and reaped profits from that conduct.

65.     While each member of the CPI Enterprise acquired, maintained control of, was associated with, and conducted or participated in the conduct of the enterprise's affairs, at all relevant times, the enterprise: (a) had an existence separate and distinct from each of its members; (b) was separate and distinct from the pattern of racketeering in which the Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including

14                                                    CLASS ACTION COMPLAINT

Defendants, along with other individuals and entities, including unknown third parties.

66.    Alternatively, each of the above-named entities constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. § 1961(4), through which the members of the enterprise conducted a pattern of racketeering activity. The separate legal statuses of the members of the CPI Enterprise facilitated the fraudulent scheme and provided a hoped-for shield from liability for Wells Fargo and its co-conspirators.

67.    The CPI Enterprise is an ongoing and continuing business organization consisting of "persons" within the meaning of 18 U.S.C. § 1961(3) that created and maintained systemic links for a single common purpose: to profit from unnecessary CPI auto insurance policies charged to borrowers who did not need them.

68.    The CPI Enterprise's members are systematically linked through contractual business arrangements, financial ties, and coordinated activities. Since at least 2006, Wells Fargo and National General engaged in the following coordinated efforts to achieve the CPI's Enterprise's goal: When a borrower obtained an auto loan from Wells Fargo, Wells Fargo sent the borrower's information to National General, which purportedly used a database to determine whether the borrower had independent insurance coverage. When National General notified Wells Fargo that a customer did not have the requisite independent insurance, Wells Fargo added a CPI policy to the customer's loan without notifying the customer and then billed the customer for premiums for the CPI policy.

69.    Wells Fargo and National General could not have achieved the goals of the CPI Enterprise without one another's assistance, and both Wells Fargo and National General reaped profits from the scheme. National General profited as the underwriter of the CPI policies, while Wells Fargo earned profits in a number of ways, including by earning commissions on each policy (until 2013) and through the receipt of increased interest payments and fees.

70.    Wells Fargo and National General regularly communicated and exchanged information about customers and insurance to facilitate the enterprise's goals. This communication typically occurred, and continues to occur, using the wires and the mail.

71.    The CPI Enterprise's members operated as a continuing unit for the purposes of

CLASS ACTION COMPLAINT

implementing the scheme, through which each member agreed to actively hide the existence of the scheme and the enterprise from others.

72.    Therefore, Wells Fargo and National General participated in the conduct of the CPI Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), which includes multiple instances of mail fraud in violation of 18 U.S.C. § 1341, and multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

73.    As part of the CPI Enterprise, Wells Fargo and National General intentionally made material misstatements regarding, among other things: (1) whether a customer required a CPI policy; (2) Wells Fargo and/or National General's protocol for assessing a customer's eligibility for a CPI policy and/or an auto loan; (3) Wells Fargo and National General's relationship, (4) the true terms and conditions of obtaining an auto loan through Wells Fargo; and (5) the true cost of obtaining an auto loan through Wells Fargo.

74.    In the absence of the above misrepresentations and borrowers' reliance on them, the CPI Enterprise could not have achieved its common purpose.

75.    The CPI Enterprise engaged in and affected interstate commerce by, among other things, advertising, setting, and affecting the price and terms of auto loans and/or insurance policies that were obtained by thousands of Class members throughout the United States, its territories, the District of Columbia, and the Commonwealth of Puerto Rico. The terms of the auto loans and insurance policies mandated that Class members make monthly insurance payments in interstate commerce to Wells Fargo.

76.    The CPI Enterprise's harmful effects can be felt to this day. Wells Fargo and National General continue to charge borrowers for CPI policies, irrespective of whether they are required under the loan's terms.

**B.    Conduct of the CPI Enterprise**

77.    Wells Fargo exerted control over the CPI Enterprise and participated in the operation or management of the affairs of the CPI Enterprise, directly or indirectly, by, among other ways: (1) misrepresenting the terms of its auto loans to its customers upon their initial application and throughout the application process; (2) transmitting loan applications and other

CLASS ACTION COMPLAINT

customer information to National General; (3) misrepresenting the role that National General played in the loan application process; (4) issuing and/or authorizing unnecessary or unauthorized CPI policies; (5) concealing the true nature of its relationship with National General; (6) paying and receiving payment from National General; (6) issuing monthly statements to Class Members including fraudulent charges; and (7) collecting monthly payments from Class Members for those charges.

78.    The hierarchical decision-making structure of the CPI Enterprise was headed by Wells Fargo. Wells Fargo controlled the terms and cost of auto-loans it issued, determined who those loans would be issued to as well as when and if a customer's application and/or information would be sent to National General for review. Wells Fargo directed National General regarding its review of auto loan policies and, ultimately, issued the CPI policies underwritten by National General and collected upon them.

79.    National General also participated in the conduct of the affairs of the CPI Enterprise, directly or indirectly, in the following ways: (1) underwriting the CPI policies issued by Wells Fargo, with knowledge of Wells Fargo's fraudulent intent; (2) reviewing auto loan applications with the aim of issuing CPI policies; (3) paying commissions to Wells Fargo for each CPI placement; (4) transmitting loan applications and other customer information to Wells Fargo; (5) misrepresenting its role in the loan application process;  (6) authorizing the issuance of unnecessary or unauthorized CPI policies; and (7) concealing the true nature of its relationship with Wells Fargo.

80.    Defendants also directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present.

**C.  Wells Fargo and National General's Pattern of Racketeering Activity**

81.    As part of carrying out, or attempting to carry out, the scheme to defraud its customers, Wells Fargo and National General knowingly conducted or participated, directly or indirectly, in the affairs of the CPI Enterprise through a pattern of racketeering activity, including acts that are indictable under 18 U.S.C. § 1341, relating to mail fraud, and 18 U.S.C. § 1343,

CLASS ACTION COMPLAINT

relating to wire fraud.

82.    By way of example, Defendants and their co-conspirators have either committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

83.    Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

    a.    **Mail Fraud**: Wells Fargo and its co-conspirator National General violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to sell the CPI policies described herein by means of false pretenses, misrepresentations, promises, and omissions.

    b.    **Wire Fraud**: Wells Fargo and its co-conspirator National General violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

84.    The CPI Enterprise's pattern of racketeering likely involved thousands of separate instances of use of the U.S. Mail or interstate wire facilities in furtherance of the enterprise's scheme. Many of the precise dates of such instances have been deliberately hidden, and cannot be specifically alleged without access to materials in the possession of Defendants.

85.    Nonetheless, Plaintiff has described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred. They include thousands of communications to perpetuate and maintain the CPI Enterprise's scheme, including the things and documents described above.

86.    Wells Fargo's and National General's use of the mails and wires also includes, but is not limited to: (1) marketing materials regarding Wells Fargo and/or National General's auto loans and insurance policies sent throughout the country by wire and mail; (2) mail and wire communications between Wells Fargo and National General establishing their relationship with respect to the CPI Enterprise and the issuance of auto loans and/or CPI policies; (3) the electronic or physical submission of auto loan applications and other customer material from Wells Fargo to

CLASS ACTION COMPLAINT

National General for approval regarding CPI policies; (4) National General's written or electronic response to those applications and requests for information from Wells Fargo; (5) written, telephone, or electronic communications regarding and/or negotiating CPI premium rates; (6) the transmission and/or distribution of CPI policy documents through the mails; (7) the use of the mails or wires to bill for or collect revenues, and/or profits from CPI policies; (8) written and electronic communications to government agencies, including but not limited to the Office of the Insurance Commissioner regarding the CPI policies issued and underwritten by National General; and (9) the use of the mails or wires to communicate regarding the administration and conduct of the CPI Enterprise.

87.    Additionally, Wells Fargo and National General communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, and other third-party entities for the purpose of furthering the CPI Enterprise's scheme.

88.    Wells Fargo and National General knew, and intended that, Plaintiff and the members of the Classes would rely on the material misrepresentations and omissions made by them and would incur increased costs as a result. Had Plaintiff and the Classes not made unnecessary payments for CPI policies, the CPI Enterprise's scheme could not have succeeded.

89.    Each of these fraudulent mailings and interstate wire transmissions constitutes "racketeering activity" within the meaning of 18 U.S.C. § 1961(1)(B). Collectively, these violations constitute a "pattern of racketeering activity," within the meaning of 18 U.S.C. § 1961(5), through which Wells Fargo and National General intended to defraud Plaintiff, members of the Class, and other intended victims.

90.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff and the Class.

91.    The mail and wire transmissions described herein were made in furtherance of the CPI Enterprise's scheme and common course of conduct designed to fraudulently extract revenue from and the Class.

92.    The pattern of racketeering activity alleged herein and the CPI Enterprise are

CLASS ACTION COMPLAINT

1   separate and distinct from each other. Likewise, Wells Fargo and National General are distinct

2   from the CPI Enterprise, they have a separate existence from the enterprise, including distinct

3   legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual

4   personhood, reporting requirements, and financial statements.

5        93.    As described herein, Wells Fargo and National General engaged in a pattern of

6   related and continuous predicate acts for years. The predicate acts constituted a variety of

7   unlawful activities, each conducted with the common purpose of extracting money from Plaintiff

8   and the Class through their misrepresentations and omissions, while forcing them to pay for

9   unnecessary and unwanted CPI policies. The predicate acts also had the same or similar results,

10  participants, victims, and methods of commission.

11       94.    Far from occurring in isolation, Defendants engaged in the above acts as part of a

12  common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), Defendants conspired to

13  violate 18 U.S.C. § 1962(c), as described herein. Various other persons, firms and corporations,

14  including third-party entities and individuals not named as defendants in this Complaint, have

15  participated as co-conspirators with Defendants in these offenses and have performed acts in

16  furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or

17  minimize losses for the Defendants and their unnamed co-conspirators throughout the illegal

18  scheme and common course of conduct.

19       95.    Defendants further aided and abetted those unnamed entities in the violations of

20  the above laws.

21  **D. The Harm Caused by the CPI Enterprise**

22       96.    As a result of Wells Fargo's and National General's conduct, primarily their

23  pattern of racketeering activity, Plaintiff and the Classes have been injured in their business

24  and/or property in multiple ways, including but not limited to paying for unnecessary auto

25  insurance premiums, interest, fees, and incurring downgraded credit.

26       97.    Defendants' violations of 18 U.S.C. § 1962(c) & (d) have directly and proximately

27  caused injuries and damages to Plaintiff and the members of the Class, entitling them to seek

28  treble damages, as well as injunctive and equitable relief, costs, and reasonable attorneys' fees

CLASS ACTION COMPLAINT

1    pursuant to 18 U.S.C. § 1964(c).

2                        **SECOND CAUSE OF ACTION**
                **Asserted on Behalf of Plaintiff and the Nationwide Class**
3                  **Violations of California's Unfair Competition Law**
                  **(Cal. Bus. & Prof. Code §§ 17200, *et seq*.)**
4

5        98.    Plaintiff incorporates by reference every prior and subsequent allegation of this

6    Complaint as if fully restated here.

7        99.    Plaintiff brings this Count on behalf of himself and the Nationwide Class against

8    Defendants.

9        100.   California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq*.,

10   protects both consumers and competitors by promoting fair competition in commercial markets

11   for goods and services. California's Unfair Competition Law is interpreted broadly and provides a

12   cause of action for any unlawful, unfair, or fraudulent business act or practice. Any unlawful,

13   unfair, or fraudulent business practice that causes injury to consumers falls within the ambit of

14   California's Unfair Competition Law.

15       101.   Within California, Wells Fargo engages in substantial sales and marketing of its

16   financial products and services and is headquartered in San Francisco. National General operates

17   in California through its agreements and collaborations with Wells Fargo.

18       102.   As described herein, Defendants' misconduct towards its auto loan customers

19   constitutes unlawful, fraudulent, or unfair business practices, insofar as (1) such conduct violates

20   numerous statutes as described herein; (2) any justification for such conduct is outweighed by the

21   harm caused to Plaintiff and the Class members; (3) such conduct is immoral, unethical,

22   oppressive, unconscionable, or substantially injurious to Plaintiff and Class members, and/or; (4)

23   such conduct has a tendency to, and did in fact, deceive Plaintiff and Class members.

24       103.   Defendants' unlawful, unfair, and fraudulent business acts and practices, as

25   described above, include, but are not limited to, wrongfully charging auto loan customers for

26   unnecessary CPI policies, refusing to cancel CPI policies despite proof of existing coverage,

27   failing to notify customers of the imposition of CPI coverage, structuring payments in a self-

28   serving manner to maximize the interest payments charged to customers, wrongfully sending its

borrowers' accounts to collections, and repossessing their vehicles.

104.    Plaintiff and Class members have been damaged by these practices, which violate California's Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, et seq., and other similar state unfair competition and unlawful business practice statutes.

### THIRD CAUSE OF ACTION
### Asserted on Behalf of Plaintiff and the Nationwide Class
### Unjust Enrichment

105.    Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

106.    Plaintiff brings this Count on behalf of himself and the Nationwide Class against Defendants.

107.    By virtue of their wrongful imposition of CPI policies and other charges and fees, and by the further omission of material facts related to its CPI policies, Defendants were unjustly enriched at the expense of Plaintiff and members of the Class, and money belonging to Plaintiff and members the Class was unjustly taken by Defendants.

108.    It would be inequitable and unconscionable for Defendants to retain the profit, benefit and other compensation they obtained from their fraudulent, deceptive, and misleading conduct alleged herein.

109.    Plaintiff and members of the Class seek restitution from Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct.

### FOURTH CAUSE OF ACTION
### Asserted on Behalf of Plaintiff and the Tying Sub-Class
### Illegal Tying in Violation of 15 U.S.C. § 1
### (Violation of the Sherman Act)

110.    Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

111.    Plaintiff brings this illegal tying claim on behalf of himself and the Tying Sub-Class comprised of all persons in the United Sates who obtained a dealer-arranged automotive loan through Wells Fargo Bank, N.A., or its subsidiaries or divisions, at a dealership at which

1    Wells Fargo was a preferred or primary lender, and who were charged for CPI and/or related fees

2    at a time when the vehicle subject to the loan was covered under a separate automobile insurance

3    policy.

4        112.    For purposes of this claim, the relevant geographic market is the United States.

5    The relevant product market is the market for dealer-arranged auto loans at automobile

6    dealerships where Wells Fargo was a preferred or primary provider of auto loans.

7        113.    Within this product market, Wells Fargo has market power due to the unique

8    competitive dynamics that exist at automobile dealerships with preferred lender relationships.

9    Unlike in the broader marketplace, consumers seeking dealer-arranged auto financing at

10   dealerships with preferred lender relationships are typically directed to a single lender or small

11   group of lenders, often with minimal consumer input and without providing comparative

12   offerings. Thus, at dealerships where Wells Fargo was a preferred or primary lender, Wells Fargo

13   had appreciable market power when borrowers sought auto loans arranged by dealers.

14       114.    Wells Fargo's sale of auto loans in this market is a separate product and/or service

15   from the sale of automobile insurance. Most auto loan customers prefer, and do in fact, purchase

16   automobile insurance separately from where they obtain automobile financing.

17       115.    By forcing Plaintiff and the members of the Tying Sub-Class to pay for unwanted

18   CPI as part of obtaining an auto loan, Wells Fargo unlawfully tied its auto loans to the CPI

19   policies underwritten by National General. Such illegal tying unreasonably restrains trade and is

20   unlawful under Section 1 of the Sherman Act.

21       116.    Moreover, there is no appropriate or legitimate business justification for

22   Defendants to force auto loan customers, such as Plaintiff and members of the Tying Sub-Class,

23   to also pay for automobile insurance.

24       117.    Defendants' illegal tying practices have caused damage to Plaintiff and the

25   members of the Tying Sub-Class in violation of Section 1 of the Sherman Act.

26                        **FIFTH CAUSE OF ACTION**
                **Asserted on Behalf of Plaintiff and the Tying Sub-Class**
27                     **Violation of 12 U.S.C. § 1972**
                        **(Bank Holding Company Act)**

28

118.    Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

119.    Plaintiff brings this claim on behalf of himself and the Tying Sub-Class, as described above.

120.    Wells Fargo is a bank within the meaning of 12 U.S.C. § 1971 and 12 U.S.C. § 1841(c).

121.    Despite purporting to allow Plaintiff and members of the Tying Sub-Class to maintain their own automobile insurance in lieu of purchasing CPI, in practice Wells Fargo required Plaintiff and members of the Tying Sub-Class to purchase CPI in exchange for financing. Each such Class Member who obtained an auto loan from Wells Fargo was also charged for CPI, regardless of whether he or she maintained independent automobile insurance.

122.    While not publicly disclosed at the time, Wells Fargo's functional requirement that certain auto loam customers purchase its CPI was unusual and not traditional in the banking industry.

123.    As set forth above, Wells Fargo's extension of credit on the conditions set out above constituted an anticompetitive tying arrangement that violates 12 U.S.C. § 1972(1).

124.    Wells Fargo's extension of credit on these terms benefited Wells Fargo because the force-placed CPI generated revenue for Wells Fargo in the form of kickbacks from National General, increased interest payments, and fees. As a direct and proximate result of Defendants' violation of 12 U.S.C. § 1972(1), Plaintiff has suffered damage and are entitled to treble damages pursuant to 12. U.S.C. § 1975.

**SIXTH CAUSE OF ACTION**
**Asserted on Behalf of Plaintiff and a Florida Subclass**
**Violations of Nevada's Deceptive Trade Practices Act ("NDTPA")**
**Nevada Revised Statutes Annotated, Chapter 598**

125.    Plaintiff incorporates by reference every prior and subsequent allegation of this Complaint as if fully restated here.

126.    Nevada Revised Statutes ("NRS") 41.600(1) provides that "an action may be brought by any person who is a victim of consumer fraud."  NRS 41.600(2) explains that

"consumer fraud" means "a deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive."

127.    To the extent it is necessary to plead, Defendants knew that the practices detailed herein that their representations as to CPI and GAP were false.

128.    By virtue of the acts and omissions detailed herein, Defendants have engaged in deceptive trade practices under the NDTPA.

129.    Defendants engaged in numerous deceptive trade practices described herein, including failing to notify customers of illegal forced-place insurance procedures, automatically deducting unnecessary CPI charges without properly informing customers of the nature of those charges, and falsely stating that amounts were due and owing that were not.

130.    As a result of Defendants' unfair and deceptive trade practices, Plaintiff and the Nevada Subclass suffered actual damages, including overcharges and expenses related to false information on their credit reports, in amounts to be proven at trial.

## PRAYER FOR RELIEF

131.    Plaintiff, on behalf of himself and all others similarly situated, requests the Court to enter judgment against Defendants, as follows:

a.    Certifying the Class, appointing Plaintiff as representative of the Class, and appointing the lawyers and law firms representing Plaintiff as counsel for the Class;

b.    Declaring Defendants' actions, as described herein, to be unlawful;

c.    Permanently enjoining Defendants from performing further unfair and unlawful acts as alleged herein;

d.    For all recoverable compensatory, statutory, and other damages sustained by Plaintiff and the Class, restitution and/or disgorgement of Defendants' profits from its unfair and unlawful practices described above, and all other relief allowed under applicable law;

e.    For costs;

CLASS ACTION COMPLAINT

f.     For both pre-judgment and post-judgment interest on any amounts awarded;

g.     For appropriate injunctive relief, including public injunctive relief;

h.     For treble damages to the extent they are allowed by applicable laws;

i.     For payment of attorneys' fees and expert fees as may be allowable under applicable law; and;

j.     For such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury as to all claims alleged in this action.

Date:  August 24, 2017

Respectfully Submitted,

*/s/ Kristen Law Sagafi*
Kristen Law Sagafi (SB# 222249)
TYCKO & ZAVAREEI LLP
483 Ninth Street. Suite 200
Oakland. CA 94607
Telephone: (510) 254-6808
Facsimile:
ksagafi@tzlegal.com

Craig L. Briskin (*pro hac vice* to be submitted)
MEHRI & SKALET, PLLC
1250 Connecticut Ave., Suite 300
Washington, DC  20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997
cbriskin@findjustice.com

M. Stephen Dampier
The Dampier Law Firm P.C.
55 N. Section Street
P.O. Box 161 (36533)
Fairhope, AL  36532
Telephone: (251) 929-0900
Facsimile: (251) 929-0800
stevedampier@dampierlaw.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT